UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
VERTIV INC. and SHILPASHREE HAREGOUDAR,

                              Docket No.:  22-cv-8162

              Plaintiffs,

     -against-                          **COMPLAINT**

MATTHEW WALSH, PARKVIEW ADVANCE LLC,
STAT CAPITAL FUNDING LLC, and PAUL GIOLLI,     **JURY TRIAL DEMANDED**

              Defendants.
------------------------------------------------------------------------X

Plaintiffs Vertiv Inc. and Shilpashree Haregoudar (collectively "Plaintiffs"), by and through their attorneys The Dweck Law Firm, LLP, complain of Defendants Matthew Walsh, Parkview Advance LLC, Stat Capital Funding LLC, and Paul Giolli (collectively "Defendants"), and respectfully allege to this Court, upon information and belief, as follows:

## NATURE OF THE ACTION

1.     Plaintiffs bring this action asserting a claim pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and related claims arising out of Defendants' illegal operation of an enterprise that markets, solicits, and collects unlawful debts and otherwise fraudulently obtains funds from Plaintiffs and other small businesses under the guise of merchant cash advance agreements, which are criminally usurious commercial loans.

## JURISDICTION AND VENUE

2.     Defendants are subject to the personal jurisdiction of this Court because they regularly transact business within the State of New York, have agreed to submit to the jurisdiction of this Court for all disputes related to the transactions at issue, and routinely invoke the jurisdiction of the courts in the City and State of New York.

3.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 based upon Plaintiffs' federal RICO claim under 18 U.S.C. § 1962(c), and supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

4. Venue in this district is proper pursuant to 28 U.S.C. §1391(b)(3) because Defendants are subject to and have consented to this Court's personal jurisdiction.

**PARTIES**

5. Plaintiff Vertiv Inc. ("Vertiv") is now, and at all times material to this action was, a foreign corporation duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal place of business located at 5 Vaughn Drive, Princeton, New Jersey.

6. Plaintiff Shilpashree Haregoudar ("S. Haregoudar") is now, and at all times material to this action was, an individual and citizen of the State of New Jersey.

7. Upon information and belief, Defendant Matthew Walsh ("Walsh") is now, and at all times material to this action was, the founder and CEO of Defendant Parkview Advance LLC and a citizen of the State of Connecticut.

8. Upon information and belief, Defendant Parkview Advance LLC ("Parkview") is now, and at all times material to this action was, a foreign limited liability company duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal place of business located at 400 Main Street, Stamford, Connecticut.

9. Upon information and belief, Parkview is registered with and authorized to do business in the State of New York pursuant to Section 802 of the New York Limited Liability Company Law.

10. Upon information and belief, Defendant Stat Capital Funding LLC ("Stat Capital") is now, and at all times material to this action was, a domestic limited liability company duly organized and existing under and by virtue of the laws of the State of New York, with an office

address located at 461 Van Brunt Street, Brooklyn, New York.

11. Upon information and belief, Defendant Paul Giolli ("Giolli") is now, and at all times material to this action was, an owner and authorized representative of Defendant Stat Capital, and an individual and citizen of the State of Florida.

## FACTUAL ALLEGATIONS

12. Vertiv is now, and at all times material to this action was, a small business engaged in providing technology and consulting services.

13. At all times material to this action, S. Haregoudar was employed by Vertiv as an administrative assistant.

14. Upon information and belief, and at all times material to this action, Parkview and Stat Capital are predatory lending companies.

15. Upon information and belief, and at all times material to this action, Defendant Walsh is the founder and CEO of Parkview, and controls and directs all aspects of Parkview's lending business.

16. Upon information and belief, and at all times material to this action, Defendant Giolli is the owner and authorized representative of Stat Capital, and controls and directs all aspects of Stat Capital's lending business.

17. Upon information and belief, and at all times material to this action, one of the financial arrangements that Defendants advertise and market to small businesses such as Vertiv is a Merchant Cash Advance ("MCA").

18. MCA agreements are financial products typically marketed to small businesses using high-pressure sales operations that purport to purchase a portion of a small business' future receivables at a discount in exchange for an up-front payment.

19. Whether categorized as an MCA, account receivable financing or any other variation, when a small business borrower assumes liability and remains liable for the debt and bears the risk of non-payment by the account debtor and the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan, there has not been a *bona fide* purchase of receivables and the MCA agreement is in substance a loan.

20. Upon information and belief, and at all times material to this action, Defendants marketed Parkview's lending business to Plaintiffs and members of the general public, as stated on the Parkview website, as America's best small business financial partner providing affordable and honest customer care and providing entrepreneurs the opportunity to make their dreams a reality.

21. Upon information and belief, and at all times material to this action, Defendant Walsh was and continues to be responsible for the day-to-day operation and management of Defendant Parkview and personally participated in marketing and negotiating the terms and conditions of Defendant Parkview's purported merchant cash advance agreements to Plaintiff Vertiv.

22. Upon information and belief, and at all times material to this action, Defendant Giolli was and continues to be responsible for the day-to-day operation and management of Defendant Stat Capital and personally participated in marketing and negotiating the terms and conditions of Defendant Parkview's purported merchant cash advance agreements to Plaintiff Vertiv.

**MCA Agreement Number 1**

23. In or around late 2020, during the peak of the Covid-19 pandemic, Vertiv was in dire need of funding for its survival as a small business to pay expenses and remain solvent.

24. Upon information and belief, in or around September/October 2020, the president and sole shareholder of Vertiv, Krishna Ghanta, received a phone call from Defendant Giolli regarding Vertiv's need for capital. During this phone call, Defendant Giolli referred Mr. Ghanta to Defendant Walsh at Parkview who Defendant Giolli referred to as his business partner.

25. In or around October 2020, Mr. Ghanta was introduced to Defendant Walsh, the founder and CEO of Parkview.

26. Mr. Ghanta informed Defendants Walsh and Giolli about Vertiv's financial struggles and need for a loan to stay in business.

27. In response, Defendants Walsh and Giolli, upon information and belief, proposed furnishing the necessary funds to Vertiv so that it could remain in business and meet its financial obligations.

28. In reliance on Defendants Walsh and Giolli's representations and promises, on or around November 10, 2020, Vertiv executed a document described as a merchant cash advance agreement with Defendant Parkview, by which Defendant Parkview purportedly purchased thirteen percent of Vertiv's future receivables, which were never identified, in exchange for funding a loan made by Defendants to Vertiv of $350,000.00 (the "First MCA Agreement"). A copy of the First MCA Agreement is annexed hereto as **Exhibit 1**.

29. The First MCA Agreement contains a personal guaranty executed by Plaintiff S. Haregoudar.

30. Pursuant to the terms of the First MCA Agreement, the $350,000.00 loan obligated Plaintiffs to repay Defendant Parkview $507,500.00 by weekly ACH transfers of $63,437.50, purportedly representing thirteen percent of Vertiv's future monthly receivables.

31. Upon execution of the First MCA Agreement, Defendants transferred to Vertiv an up-front payment of $315,000.00, purportedly representing the $350,000 loan after Defendants deducted $35,000 as a purported origination fee.

32. In accordance with the terms of the First MCA Agreement, Vertiv remitted to Defendants eight timely payments in full satisfaction of Plaintiffs' obligations under the First MCA Agreement.

33. The amount repaid by Vertiv under the First MCA Agreement over and above Defendants' up-front loan of $315,000 is $175,000, which represents criminally usurious interest of approximately 55%, which is annualized interest of over approximately 300%.

**MCA Agreement Number 2**

34. Thereafter, on or around January 11, 2021, Vertiv entered into a second MCA agreement with Defendant Parkview (the "Second MCA Agreement"). A copy of the Second MCA Agreement is annexed hereto as **Exhibit 2**.

35. The Second MCA Agreement also contains a personal guaranty executed by Plaintiff S. Haregoudar.

36. The Second MCA Agreement provided for an up-front payment to Vertiv in the amount of $500,000, which Plaintiffs were required to repay in the amount of $725,000.

37. Vertiv's repayment of the $725,000 was to be made by daily ACH transfers of $14,000, which purportedly represents twenty-five percent of Vertiv's unidentified future monthly receivables.

38. On or around January 11, 2021, Defendants disbursed a portion of the $500,000 up-front payment to Vertiv in the amount of $250,000, of which Vertiv received only $191,562.50.

The shortfall of $58,437.50 between the amount purportedly disbursed of $250,000 and the $191,562.50 actually disbursed by Defendants represents a purported origination fee.

39. The amount that Plaintiffs were obligated to repay under the Second MCA Agreement for Defendants' initial disbursement of $191,562.50 is $362,500, representing interest of approximately 89%, which is annualized interest of approximately 320%.

40. On or around January 15, 2021, Defendants made a second distribution of $21,000 of which Vertiv received $20,000. The shortfall of $1,000 between the amount purportedly disbursed of $21,000 and the $20,000 actually disbursed represents a purported origination fee.

41. The amount that Plaintiffs were obligated to repay under the Second MCA Agreement for Defendants' second distribution of $20,000 is $30,450, representing interest of approximately 52%, which is annualized interest of approximately 200%.

42. On or around January 20, 2021, Defendants made a third distribution of $52,500 of which Vertiv received $50,000. The shortfall of $2,500 between the amount purportedly disbursed by Defendants and the amount received by Vertiv represents a purported origination fee of $2,500.

43. The amount that Plaintiffs were obligated to repay under the Second MCA Agreement for Defendants' third distribution of $50,000 is $76,125, representing interest of approximately 52%, which is annualized interest of approximately 200%.

44. On or around January 22, 2021, Defendants made a fourth distribution of $23,100 of which Vertiv received $22,000. The shortfall of $1,100 between the amount purportedly disbursed by Defendants and the amount received by Vertiv represents a purported origination fee of $1,100.

45. The amount that Plaintiffs were obligated to repay under the Second MCA Agreement for Defendants' fourth distribution of $22,000 is $33,495, representing interest of approximately 52%, which is annualized interest of approximately 200%.

46. On or around January 26, 2021, Defendants made a fifth distribution of $135,450 of which Vertiv received $129,000. The shortfall of $6,450 represents a purported origination fee.

47. The amount that Plaintiffs were obligated to repay under the Second MCA Agreement for Defendants' fifth distribution of $129,000 is $196,402.50, representing interest of approximately 52%, which is annualized interest of approximately 200%.

48. Presently, upon information and belief, there is $175,100 that has not been repaid by Vertiv pursuant to the Second MCA Agreement.

49. The $175,100 that remains unpaid by Vertiv pursuant to the Second MCA Agreement, represents a portion of the $362,500 that Plaintiffs were obligated to repay on Defendants' first distribution of $191,562.50.

**MCA Agreement Number 3**

50. On or around January 29, 2021, Vertiv entered into a third MCA agreement with Defendant Parkview (the "Third MCA Agreement"). A copy of the Third MCA Agreement is annexed hereto as **Exhibit 3**.

51. The Third MCA Agreement contains a personal guaranty executed by Plaintiff S. Haregoudar.

52. The Third MCA Agreement provides for an up-front payment to Vertiv in the amount of $34,550, which Plaintiffs were required to repay in the amount of $50,097.50.

53. Vertiv's repayment of the $50,097.50 was to be made by daily ACH transfers of $1,001.95, which purportedly represents twenty-five percent of Vertiv's future monthly receivables, which were still unidentified.

54. On or around February 1, 2021, Defendants disbursed a portion of the up-front payment to Vertiv in the amount of $27,000. The shortfall represents a purported origination fee.

55. Presently, Vertiv has timely repaid the entirety of the loan made pursuant to the Third MCA Agreement.

**The MCA Agreements Constitute Criminally Usurious Loans**

56. The funds that Defendants advanced to Plaintiffs under the First, Second, and Third MCA Agreements (collectively the "MCA Agreements") constitute criminally usurious loans under New York Law. The MCA Agreements constitute loans, and not a *bona fide* purchase of receivables, because, among other things, Plaintiffs' repayment obligations are absolute and not contingent on Vertiv's actual accounts receivable.

57. Defendants did not assume the risk that Vertiv would have less-than-expected or no revenues, demonstrating that the economic substance of the transactions is a loan.

58. The MCA Agreements provide that Plaintiffs must, among other things, execute a Merchant Deposit Agreement permitting Parkview to make daily or weekly ACH debits of predetermined amounts. The Merchant Deposit Agreement cannot be revoked by Plaintiffs without Defendants' written consent.

59. The MCA Agreements require Plaintiffs to provide Parkview with a signed confession of judgment for the amount that Plaintiffs are obligated to repay under the MCA Agreements, which may be entered and enforced by Defendants for Plaintiffs' purported breach of the MCA Agreements.

60. The MCA Agreements contain acceleration clauses requiring the full amount of the loans to become immediately due in the event of default.

61. The MCA Agreements also contain other unconscionable, one-sided terms, including, but not limited to, Parkview holding secured interests pursuant to the UCC; requiring Vertiv to provide Parkview with its passwords and all other information necessary to log into Vertiv's bank accounts; requiring Vertiv to sign a blanket power-of-attorney in favor of Parkview; requiring Vertiv to assign its office lease to Parkview; and requiring Vertiv to grant Parkview an irrevocable power of attorney and appoint Parkview its attorney-in-fact to take any and all action to recover sums purportedly due to it.

62. The MCA Agreements also contain four defined terms that clearly demonstrate the agreements are criminally usurious loans that have nothing to do with purchasing a percentage of Vertiv's future monthly receivables.

63. The first defined term that each agreement contains is "Purchase Price," which is the monetary amount that Parkview purportedly loaned to Vertiv.

64. The second defined term that each agreement contains is "Specified Percentage," which is the percentage of Vertiv's future monthly receivables that Vertiv purportedly sold to Parkview as consideration for Parkview's upfront loan, to wit, the Purchase Price.

65. The third defined term that each agreement contains is "Specific Amount," which is the monetary amount that Parkview debits from Vertiv's bank account on a daily or weekly basis in repayment of the loan, to wit, the Purchase Price. As expressly set forth in Paragraph 1.1 of each MCA Agreement, the Specific Amount is intended to represent the Specified Percentage of Vertiv's monthly receivables that Parkview purportedly purchased.

66. The fourth defined term that each agreement contains is "Purchased Amount," which is the total amount that Vertiv is obligated to repay Parkview in satisfaction of the upfront loan, to wit, the Purchase Price.

67. Putting all four terms together, the loan (Purchase Price) must be repaid by Vertiv under a recurring and fixed schedule of ACH direct debits (Specific Amount), which are supposed to equal the percentage of Vertiv's monthly receivables that Parkview purportedly purchased (the Specified Percentage), until Vertiv has repaid the full amount of the loan with interest (the Purchased Amount).

68. The Specified Percentage of Vertiv's future receivables that Parkview purportedly purchased pursuant to the Third MCA Agreement purportedly represents twenty-five percent (25%) of Vertiv's receivables each calendar month.

69. The Specified Percentage in the Third MCA Agreement had nothing to do with the monthly receivables generated by Vertiv at the time it entered into the agreement on or around January 29, 2021.

70. Upon information and belief, Vertiv never provided Defendants with any financial information before entering into any of the MCA Agreements that would enable Defendants to approximate Vertiv's monthly revenue and/or receivables, or that would support a claim that the daily payment of $1,001.95 (the Specific Amount) due under the Third MCA Agreement represents 25% of Vertiv's monthly receivables at that time (the Specified Percentage).

71. This is further supported by the fact that the parties entered into the Second MCA Agreement on January 11, 2021, eighteen (18) days prior to executing the Third MCA Agreement. Despite entering into both MCA Agreements the same month, Vertiv's purported monthly receivables are grossly inconsistent.

72. The Specified Percentage of Vertiv's monthly receivables that Parkview claims to be purchasing in both the Second and Third MCA Agreements is the same, 25%. Yet the Second MCA Agreement obligates Vertiv to make daily payments of $14,000 and the Third MCA Agreement obligates Vertiv to make daily payments of $1,001.95 despite both agreements being entered in January 2021.

73. Similarly inconsistent is the First MCA Agreement, which obligated Vertiv to make weekly payments to Parkview of $63,437.50 (the Specific Amount), which purportedly represents thirteen percent (13%) of Vertiv's monthly receivables (the Specified Percentage).

74. Four weekly payments of $63,437.50 equals $253,750, which according the First MCA Agreement represents 13% of Vertiv's monthly receivables as of November 10, 2020. These figures are grossly inconsistent with the percentages and monthly payment amounts set forth in the Second and Third MCA Agreements and are not based upon the true receivables of Vertiv at that time.

75. Put simply, the Specified Percentage in each of Defendants' MCA Agreements has nothing to do with the amount of Vertiv's recurring repayment obligations, nor does it have anything to do with Vertiv's monthly receivables.

76. In contrast to the gross inconsistencies with respect to Specified Percentage and Specific Amount set forth in the MCA Agreements, the repayment term under the three MCA Agreements is very consistent.

77. Under the First MCA Agreement, it would take Vertiv 56 days to repay $507,500 (the Purchased Amount) through weekly ACH transfers of $63,437.50 (the Specific Amount).

78. Under the Second MCA Agreement, it would take Vertiv approximately 52 days to repay $725,000 (the Purchased Amount) through daily ACH transfers of $14,000 (the Specific Amount).

79. Under the Third MCA Agreement, it would take Vertiv 50 days to repay $50,097.50 (the Purchased Amount) through daily ACH transfers of $1,001.95 (the Specific Amount).

80. Upon information and belief, Defendant Parkview has commenced hundreds of lawsuits in New York State Supreme Court for breach of the same boilerplate MCA Agreement revised on May 31, 2016 that Defendants used with Plaintiffs. A representative selection of MCA Agreements filed by Parkview in state court actions is annexed hereto as **Exhibit 4**.

81. Regardless of whether the borrower is a Texas corporation, an Arkansas sole proprietorship, or a Georgia limited liability company, the specific monetary amount that Defendants debit from the defendant-borrowers' accounts each day pursuant to the MCA Agreement results in the loan being repaid in 50 days. This further demonstrates that the Specified Percentage set forth in each MCA Agreement is a complete fiction and has nothing to do with the borrower's monthly receivables.

## AS AND FOR A FIRST CAUSE OF ACTION
## <u>CIVIL RICO: 18 U.S.C. § 1962(c)</u>

82. Plaintiffs repeat and reallege each and every allegation contained within Paragraphs "1" through "81" of the Complaint as though more fully set forth at length herein.

83. It is "unlawful for any person employed by or associated with any enterprise engaged in …interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through…collection of unlawful debt." 18 U.S.C. § 1962(c).

84. "Unlawful debt" is defined as a debt that is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and which was incurred in connection with the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate. 18 U.S.C. § 1961(6).

85. The collection of an unlawful debt itself violates RICO even without a pattern of racketeering activity. 18 U.S.C. § 1962.

86. Under New York law, a person or entity engages in usury when it charges, takes, or receives interest on a loan at an annual rate above 16%. N.Y. Gen. Oblig. Law §5-501(1); Banking Law §14-a(1).

87. A person or entity commits criminal usury when it charges, takes, or receives interest on a loan at a rate above 25%. Penal Law §190.40.

88. Upon information and belief, and at all times material to this action, Defendants Walsh and Giolli and Defendants Parkview and Stat Capital are two distinct entities under 18 U.S.C. § 1962(c).

89. Upon information and belief, and at all times material to this action, Defendants Walsh and Giolli are "persons" within the meaning of 18 U.S.C. § 1962(c).

90. Upon information and belief, and at all times material to this action, Defendant Walsh is the founder and owner of Defendant Parkview.

91. Upon information and belief, and at all times material to this action, Defendant Giolli is an owner and authorized representative of Defendant Stat Capital.

92. Upon information and belief, and at all times material to this action, Defendants Parkview and Stat Capital constitute an "enterprise" within the meaning of 18 U.S.C. § 1962(c).

93. Upon information and belief, and at all times material to this action, Defendants Parkview and Stat Capital are an enterprise, through their employees, agents and representatives, that has a common goal of soliciting, funding, servicing and collecting usurious loans that charge interest at more than twice the legal rate under the laws of the State of New York.

94. Upon information and belief, and at all times material to this action, the debts evidenced by the First, Second, and Third MCA Agreements, each constitute an unlawful debt within the meaning of 18 U.S.C. § 1962(c) because it violates the New York criminal usury statute and is more than twice the legal rate permitted pursuant to New York Penal Law § 190.40.

95. Upon information and belief, and at all times material to this action, Defendants were fully aware that the interest rate charged to Vertiv under the First, Second, and Third MCA Agreements exceeded 25% percent and was usurious under New York law, and Defendants willfully collected the proceeds of the usurious loans.

96. Upon information and belief, and at all times material to this action, Defendant Walsh is responsible for the day-to-day operation and management of Defendant Parkview and personally participated in marketing and negotiating the First, Second and Third MCA Agreements between Parkview and Vertiv.

97. Upon information and belief, and at all times material to this action, Defendant Giolli is responsible for the day-to-day operation and management of Defendant Stat Capital and personally participated in marketing and negotiating the First, Second and Third MCA Agreements between Parkview and Vertiv.

98. Upon information and belief, and at all times material to this action, Defendants Walsh and Giolli's conduct with respect to the First, Second, and Third MCA Agreements includes, but is not limited to, determining the amount that was to be loaned to Vertiv, the

repayment term, the rate of interest charged to Vertiv, the amount and frequency of the ACH transfers to be debited from Vertiv's bank account in repayment of the loans, and all of the terms and conditions set forth in the MCA Agreements.

99. Upon information and belief, and at all times material to this action, Defendants Walsh and Giolli are responsible for creating, approving and implementing the policies, practices and procedures utilized by the enterprise, Parkview and Stat Capital, to achieves its goals and purposes, including, but not limited to, the secured merchant agreement used by Defendant Parkview to disguise the unlawful nature of its loans, to conceal the criminal usurious interest rates of the loans, and to conceal the fact that Parkview and Stat Capital are an enterprise engaged in interstate commerce in the business of collecting unlawful debts.

100. Upon information and belief, and at all times material to this action, Defendants profited financially from the enterprise by, among other things, collecting exorbitant and criminally usurious interest rates on sums greater than the amount of money actually loaned to Vertiv under the First, Second, and Third MCA Agreements, charging and collecting exorbitant and undisclosed origination, processing, and other fees.

101. Upon information and belief, and at all times material to this action, Defendants engage in interstate commerce and use the instrumentalities of interstate commerce in their daily business activities, including negotiating, issuing and collecting the criminally usurious loans set forth in the First, Second, and Third MCA Agreements.

102. Upon information and belief, and at all times material to this action, Defendants originate, fund, service and collect usurious loans made by the enterprise from its offices in New York and Connecticut, to borrowers such as Vertiv, which is a New Jersey resident and citizen, and to other borrowers throughout the United States, using interstate emails, the United States

Postal Service, private mail carriers, telephone, and internet services, as well as to collect payments on the unlawful debts using Automated Clearing House debits from Vertiv's bank accounts and the bank accounts of Defendants' borrowers throughout the United States.

103. Upon information and belief, and at all times material to this action, all communications between Defendants and Plaintiffs were by interstate email and mail, wire transfers and ACH debits, phone calls and other interstate wire communications.

104. Upon information and belief, Defendants Walsh and Giolli's communications with Vertiv's president Krishna Ghanta regarding the First, Second, and Third MCA Agreements included threats and intimidation, including, but not limited to, indicating that they knew Mr. Ghanta's family.

105. Upon information and belief, and at all times material to this action, Defendants utilized interstate emails to originate, underwrite, service and collect the funds loaned pursuant to the First, Second and Third MCA Agreements, fund the monies advanced pursuant to each of the MCA Agreements, and to collect the payments using interstate electronic ACH debits and transfers.

106. Upon information and belief, and at all times material to this action, the MCA Agreements were DocuSigned by Plaintiffs in New Jersey, and transported through interstate transmissions to Defendants' offices in Connecticut by electronic mail.

107. Upon information and belief, and at all times material to this action, Plaintiffs have and continue to sustain financial injury caused directly and proximately by Defendants' violations of 18 U.S.C. § 1962(c) in an amount to be determined at trial, but in no event less than the jurisdictional limits of this Court.

108. Plaintiffs' damages have been directly and proximately caused by Defendants' violations, including but not limited to, paying hundreds of thousands of dollars in loan repayments and advances made at criminally usurious rates, through daily and weekly ACH debits made by Defendants.

109. Plaintiffs have also suffered damages by incurring attorney's fees and costs associated with prosecuting Defendants' RICO violations in the instant action.

110. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to an award and shall recover from Defendants treble damages as well as costs and attorney's fees.

## AS AND FOR A SECOND CAUSE OF ACTION
## BREACH OF CONTRACT

111. Plaintiffs repeat and reallege each and every allegation contained within Paragraphs "1" through "110" of the Complaint as though more fully set forth at length herein.

112. Upon information and belief, pursuant to the First, Second, and Third MCA Agreements between Defendant Parkview and Plaintiffs, Parkview agreed to loan Vertiv $350,000.00, $500,000, and $34,550, respectively, and Plaintiffs agreed to repay the loans with interest.

113. Upon information and belief, the First, Second, and Third MCA Agreements include an "Appendix A" that sets forth a list of all fees applicable to the agreements.

114. Upon information and belief, Appendix A states that the Origination Fee for Parkview's underwriting and related expenses with respect to the loans shall be $295.00.

115. Upon information and belief, Defendant Parkview breached the First MCA Agreement by deducting approximately $35,000 from the $350,000 loan as a purported origination fee in violation of the fee schedule set forth in Appendix A, any by charging Plaintiffs criminally usurious interest on the face amount of the loan, not the amount actually received by Vertiv.

116. Upon information and belief, Defendant Parkview breached the Second MCA Agreement by deducting approximately $60,437.5 from the $500,000 loan as purported origination fee in violation of the fee schedule set forth in Appendix A, and by charging Plaintiffs usurious interest on the face amount of the loan, not the amount actually received by Vertiv.

117. Upon information and belief, Defendant Parkview breached the Third MCA Agreement by deducting approximately $7,550 from the $34,550 loan as a purported origination fee in violation of the fee schedule set forth in Appendix A, and by charging Plaintiffs interest on the face amount of the loan, not the amount actually received by Vertiv.

118. By reason of the foregoing, Plaintiffs have been damaged and demand judgment against Parkview in an amount determined at trial, together with interest, costs, and reasonable attorney's fees.

119. Upon information and belief, the amount of damages sought exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## AS AND FOR A THIRD CAUSE OF ACTION
## UNJUST ENRICHMENT

120. Plaintiffs repeat and reallege each and every allegation contained within Paragraphs "1" through "119" of the Complaint as though more fully set forth at length herein.

121. Upon information and belief, Defendants have benefited from Plaintiffs' repayment of the loans set forth in the First, Second, and Third MCA Agreements, including Defendants' receipt of payments for exorbitant and illegal origination fees in breach of the terms of the agreements, receipt of payments made by Plaintiffs at criminally usurious interest rates, and receipt of interest calculated on sums greater than what Defendants actually loaned to Plaintiffs.

122. Upon information and belief, Defendants continue to benefit from their collection and retention of fees and criminally usurious interest at Plaintiffs' expense and have been unjustly enriched thereby.

123. By reason of the foregoing, Plaintiffs have been damaged and demand judgment against Defendants in an amount determined at trial, together with interest, costs, and reasonable attorney's fees.

124. Upon information and belief, the amount of damages sought exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

On the First Cause of Action for Civil RICO, awarding Plaintiffs treble damages, together with costs and reasonable attorney's fees in an amount to be determined at the jury trial;

On the Second and Third Causes of Action for Breach of Contract and Unjust Enrichment, awarding Plaintiffs compensatory and consequential damages, costs and reasonable attorney's fees in an amount to be determined at the jury trial; and

Such other and further relief as this Court may deem just and proper.

**THE DWECK LAW FIRM, LLP**
*Attorneys for Plaintiffs*

By: _____
Christopher S. Fraser (CF-7590)
1 Rockefeller Plaza, Suite 1712
New York, New York 10020
Telephone: (212) 687-8200
Email: cfraser@dwecklaw.com